UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GREGORY S. KURISH

        Plaintiff,                         Civil Action No. 11-cv-15637

        v.                              District Judge Bernard A. Friedman
                                 Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION TO
GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [9] AND
<u>DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [12]</u>**

Plaintiff Gregory Kurish appeals Defendant Commissioner of Social Security's ("Commissioner") denial of his application for Period of Disability and Disability Insurance Benefits. (*See* ECF No. 1, Compl.; Transcript ("Tr.") 1, 26.) Before the Court for a Report and Recommendation (ECF No. 3) are the parties' cross-motions for summary judgment (ECF Nos. 9, 12). For the reasons set forth below, this Court finds that, without further explanation from the Administrative Law Judge, the Court cannot conclude that substantial evidence supports his decision to exclude all mental limitations from the residual functional capacity assessment and related vocational expert hypotheticals. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 9) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (ECF No. 12) be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## I. BACKGROUND

Mr. Kurish was 35 years old when he allegedly became disabled.  (*See* Tr. 135.)  He holds an associate degree in computer-aided technology and/or design engineering.  (Tr. 50.)  In the past, Plaintiff worked as a design technician and design drafter on computer aided design ("CAD") systems.  (Tr. 62.)  Plaintiff asserts that symptoms related to Parkinsonism or Parkinson's disease prevent him from working.

### A.  Procedural History

On June 2, 2009, Plaintiff applied for Period of Disability and Disability Insurance Benefits asserting that he became unable to work on February 22, 2007.  (Tr. 26.)  The Commissioner initially denied Plaintiff's disability application on October 8, 2009.  (Tr. 26.)  Plaintiff then requested an administrative hearing, and on December 1, 2010, he appeared with counsel before Administrative Law Judge Michael E. Finnie, who considered his case *de novo*.  (Tr. 26-36, 42-66.)  In a February 5, 2011 decision, the ALJ found that Plaintiff was not disabled.  (*See* Tr. 26-36.)  The ALJ's decision became the final decision of the Commissioner on November 21, 2011 when the Social Security Administration's Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Plaintiff filed this suit on December 27, 2011.  (ECF No. 1, Compl.)

### B.  Medical Evidence

Plaintiff treated at Michigan Neurological Associates ("Michigan Neurological") from October 2006  through July 2008.  For the majority of the visits, Plaintiff saw Dr. Lawrence Konst, a board eligible neurologist.  In October 2006, Plaintiff reported bilateral hand tremors as well as tremors in his chest, legs, and feet.  (Tr. 238.)  Kurish did not believe his tremors were related to anxiety, but admitted that his job as a robotics engineer was stressful.  (*Id.*) Dr. Konst's neurological

2

exam revealed tremors beginning in Plaintiff's trunk causing Plaintiff's head and extremities to have a "resting tremor." (*Id.*) Dr. Konst started Plaintiff on Topamax, "a drug to help treat general tremor." (Tr. 238.)

In November 2006, Kurish reported to Dr. Konst that his tremors had "slightly" improved on Topamax. (Tr. 237.) Dr. Konst noted that Plaintiff has some upper-extremity "intention tremors" (rhythmic, oscillatory, involuntary motion during voluntary movements, Dorland's Illustrated Medical Dictionary, 1984 (31st ed. 2007)) that seemed to worsen with nervousness and anxiety. (Tr. 237.) Dr. Konst provided Plaintiff a prescription of Xanax. (*Id.*)

At the December 2006 follow-up, Dr. Konst noted that Plaintiff "continue[d] to suffer from the benign essential tremor [i.e., heredity tremor aggravated by emotion factors and accentuated by voluntary movement, Dorland's Illustrated Medical Dictionary, 1984 (31st ed. 2007)], with head titubation, and an intention tremor." (Tr. 236.) The neurological exam revealed no cogwheeling, bradyphrenia, or bradykinesia, however. (*Id.*)[1] Dr. Konst added Calan and Sinemet to the Xanax and (reduced) Topamax prescriptions. (*Id.*)

In January 2007, Plaintiff reported slight improvement with Sinemet. (Tr. 235.) Plaintiff also admitted to an "anxiety component to his symptoms." (*Id.*) The next month, Kurish reported that his tremors were not as controlled; he also reported, however, that he had run out of medication. (Tr. 234.) In April 2007, Plaintiff, who was then taking Sinemet (and Mirapex), reported to Dr. Konst that his tremors had "greatly reduced." (Tr. 233.)

---

[1]"Cogwheeling" is the "'pullback,' jerky or ratcheting effect in an arm or leg that the doctor perceives when moving a patient's rigid limb." Patrick McNamara, Ph.D., About.com, Parkinson's Disease, http://parkinsons.about.com/od/ glossary/g/cogwheeling.htm (last visited Oct. 26, 2012). Bradyphrenia is slowness of thought or fatigability of initiative. Dorland's Illustrated Medical Dictionary 249 (31st ed. 2007). Bradykinesia is slowness of muscular movement. *Id.* at 249.

In September 2007, however, Plaintiff reported that his tremors had worsened in the previous months but that his anxiety had also increased. (Tr. 231.) On exam, Dr. Konst found spasticity and "significant cogwheeling bilaterally." (*Id.*) He also noted that Kurish's tremors "exacerbated with activity." (*Id.*)

The next month, Plaintiff returned for another follow-up at Michigan Neurology. (Tr. 229.) Kurish reported to Dr. Konst that his tremors had remained the same and that Sinemet did not seem to be working. (*Id.*) On exam, Dr. Konst noted muscle spasticity in Plaintiff's lower extremities and "gross tremors" in both hands when at rest. (*Id.*) Dr. Konst discontinued Sinemet and prescribed Mysoline. (*Id.*)

Plaintiff next saw Dr. Konst in February 2008. (Tr. 227-28.) Kurish told Dr. Konst that his tremors had recently increased and that Mysoline was not helpful. (Tr. 227.) On exam, Dr. Konst found "noted saccades with pursuit" (a series of involuntary, abrupt, rapid, small movements or jerks of both eyes, Dorland's Illustrated Medical Dictionary, 1685 (31st ed. 2007)), "mild tongue tremor," bilateral cogwheeling, dysdiadochokinesia (impaired ability to perform rapidly alternating movements, *see id.* at 584), and dysmetria (improper estimation of needed movement, *see id.* at 586). (Tr. 227.) Dr. Konst's impression was anxiety, L5 disc herniation, and parkinsonism: a condition that involves the movement abnormalities seen in Parkinson's disease, but not necessarily Parkinson's disease, Eric Ahlskog, M.D., Mayo Clinic Website, *Parkinsonism: Causes and Coping Strategies* (Aug. 23, 2011), http://www.mayoclinic.com/health/parkinsonism/AN01178. (Tr. 227.) Dr. Konst noted that past toxic exposure should be ruled out and altered Plaintiff's medications, including increased dosage of Mirapex. (Tr. 228.)

In April 2008, Plaintiff reported to Dr. Steven Beall at Michigan Neurology that, while his

tremors continued, Mirapex appeared to help.  (Tr. 225.)  Plaintiff's exam was similar to that in February 2008: saccades with pursuit, tongue tremor, bilateral cogwheeling, dysdiadochokinesia, and dysmetria.  (Tr. 225.)  Dr. Beall also noted masked facies: a masklike and immobile facial expression, usually occurring with Parkinson's disease.  Mosby's Medical Dictionary (8th ed. 2009), http://medical-dictionary.thefreedictionary.com/parkinsonian+facies.  (*Id.*)  Dr. Beall's impression was anxiety, history of L5 disc herniation, and "Parkinsonism versus Parkinson's disease."  (*Id.*)  Dr. Beall continued Plaintiff on Mirapex, ordered labs, and requested an MRI of Plaintiff's brain.  (Tr. 226.)

In July 2008, Plaintiff returned to Michigan Neurology and saw Dr. Thomas Giancarlo.  (Tr. 223-24.)  Similar to Plaintiff's recent exams, Dr. Giancarlo found saccades on pursuit, bilateral cogwheel rigidity, bilateral hand tremors, dysdiadochokinesia, and dysmetria.  (*Id.*)  He further noted that Kurish had a "notable increase in his rigidity and stiffness since his last visit."  (*Id.*)  Dr. Giancarlo's impression was "possible Parkinsonism" and anxiety.  (*Id.*)

In August 2008, Plaintiff had a consultative exam with Shana Krstevska, apparently a neurologist.  (Tr. 216-17.)  Dr. Krstevska found that Plaintiff's speech was fluent with no dysarthria or apahsia and that his "[f]und of knowledge" was appropriate.  (Tr. 217.)  Kurish's strength in his upper and lower extremities was "inconsistent and distractible," and his handwriting was shaky.  (Tr. 217.)  Dr. Krstevska impression was "body tremor with the entire arm[,] not distally at the wrist[,] and fluctuation and tone inconsistent with Parkinson's disease."  (*Id.*)  Dr. Krstevska referred Plaintiff to a behavioral health clinic and provided contact information for "relaxation therapy and coping mechanism."  (*Id.*)

In September 2009, Dr. Asit Ray, evaluated Plaintiff for Michigan's Disability

5

Determination Service.  (Tr. 246-49.)  Dr. Ray summarized his findings as follows:

> [Mr. Kurish] shows shaking in both his upper and the lower extremities and it is coarse tremor.  He is ambulatory without any devices in spite of his shaking.  He did not lose any balance during ambulation. The neuro examination is essentially normal except he shows rigidity in the upper extremities. He is independent in his self-care and activities of daily living including his driving.   The presentation of the tremor and shaking does not fit with Parkinson type of tremor.  He had [an] MRI of the brain which has turned out to be negative.

(Tr. 248.) He then concluded, "Based on the history as well as physical examination it is my opinion that Gregory Kurish should be able to perform his usual and customary activities including his occupational duties."  (*Id.*)

Later in September 2009, Dr. B.D. Choi reviewed Plaintiff's medical file and completed a "Physical Residual Functional Capacity Assessment" form.  (Tr. 269-75.)  Although noting that Kurish had coarse tremor in both his upper and lower extremities, and that Plaintiff had rigidity in his upper extremities, Dr. Choi nonetheless concluded that Plaintiff could perform the core exertional limitations of light work: lifting 20 pounds occasionally, 10 pounds frequently, standing and/or walking for about six hours in an eight-hour workday, sitting for about six hours in an eight-hour workday, and engaging in "unlimited" pushing and pulling (including operating hand and foot controls).  (Tr. 269.)  Dr. Choi further found that the medical evidence did not establish any "manipulative limitations," including handling or fingering.  (Tr. 271.)

In October 2009, Rom Kriauciunas, Ph.D., completed a "Psychiatric Review Technique" form ("PRTF") for the SSA.  (Tr. 254-66.)  After reviewing medical records through August 2008, Dr. Kriauciunas found that Plaintiff's anxiety-related disorder was not a "severe" impairment.  (Tr. 254.)

In November 2009, Dr. Rajiv Agrawal, Plaintiff's primary-care physician since January 2006 (Tr. 155), provided a "To Whom It May Concern" opinion letter. (Tr. 277.) In relevant part, Dr. Agrawal stated:

> Gregory Kurish has Parkinsonism and currently manifests symptoms of Tremor, Rigidity, Bradykinesia, Festinating gait, Flat facial expression, Slowed mentation, and Depression. Patient was clinically diagnosed by neurology. . . . Some days [Mr. Kurish] is unable to get out of bed and perform duties associated with activities of daily living. Patient is affected mentally, causing depression and is unable to work or function normally, therefore is applying for disability. In my medical opinion he is totally disabled from all types of work.

(Tr. 277.)

The record before the ALJ also includes treatment notes from Plaintiff's February and May 2010 visits to Michigan Neurology. (Tr. 279, 282.) In February 2010, Dr. Giancarlo reviewed a brain MRI and noted that it was "within normal limits with the exception of a mild patchy mucosal thickening seen scattered throughout the paranasal sinuses." (Tr. 279.) Dr. Giancarlo noted that "the appearance of [Kurish's] brain [was] unchanged since [October 2006]." (*Id.*) He also performed a neurocognitive evaluation which indicated that Kurish was

> experiencing cognitive difficulties especially with memory function. Recall and recognition appear equally impaired indicating problems with storage and retrieval. Verbal fluency processing speed, and attention are also . . . deficient for [his] age. Stress does appear to exacerbate memory difficulties. Psychological testing, however, does not indicate the presence of anxiety disorder or other primary psychological illness. Compulsive personality features were noted.

(Tr. 279.) Dr. Giancarlo's impression was Parkinsonian symptoms, questionable anxiety/compulsive disorder, memory impairment, and to rule out thyroid disease. (*Id.*)

In May 2010, Plaintiff had a follow-up visit with someone at Michigan Neurology, perhaps

Dr. Giancarlo. (Tr. 282.) Plaintiff reported that his tremors were relatively unchanged and, when he pushed himself physically, they could become more prominent. (Tr. 282.) Kurish reported that his memory was unchanged since the prior visit. (*Id.*) A physical exam revealed anxious affect, mild masked facies, mild left cogwheel rigidity, dysdiadochokinesia, corase tremor, and index finger "clubbing" on both hands. (*Id.*)

In December 2010, Dr. Agrawal provided another opinion letter. The substance is nearly identical to his earlier letter:

> This is an updated version of the previous letter from November 2009. Mr. Kurish's symptoms have not changed since the writing of the previous letter — he has Parkingsonism [*sic*] which currently manifests symptoms of Tremor, Rigidity, Bradykinesia, Festinating gait, Flat facial expression, Slowed mentation, and Depression. . . . Some days the patient is unable to get out of bed and perform duties associated with activities of daily living. Patient is affected mentally, causing depression and is unable to work or function normally. In my medical opinion he is totally disabled from all types of work.

(Tr. 284.)

Plaintiff submitted some of Dr. Agrawal's treatment notes (and other records) to the Appeals Council. (Tr. 286-314; *see also* Tr. 5.) But these records were not before the ALJ and the Appeals Council denied Kurish's request for review. (Tr. 1.) Accordingly, the Court will not consider these records in reviewing the ALJ's decision. *See Davenport v. Comm'r of Soc. Sec.*, No. 10-13842, 2012 WL 414821, at *1, n. 1 (Jan. 19, 2012), *report and recommendation adopted by* 2012 WL 401015 (E.D. Mich. Feb. 8, 2012) ("In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision . . . those 'AC' exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review." (citing *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th

8

Cir.1996))).

### C.  Testimony at the Hearing Before the ALJ

A medical expert, Plaintiff, and a vocational expert testified at the December 1, 2010 hearing before ALJ Finnie.

#### 1.  *Medical Expert's Testimony*

Dr. Albert Oguejiofor, a board-certified internist who had reviewed Plaintiff's medical records prior to the hearing, offered an opinion about Plaintiff's functional capacity.  After specifically noting an August 2008 exam (likely the consultative exam by Shana Krstevska), Dr. Ray's September 2009 consultative exam, and Dr. Giancarlo's February 2010 exam, Dr. Oguejiofor stated, "I feel that he can function at the light [residual functional capacity level]." (Tr. 47-48.) The ALJ confirmed with Dr. Oguejiofor that this meant the ability to occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for about six hours in an eight-hour workday and sit for about six hours of an eight-hour workday. (Tr. 48.) When Kurish's counsel asked Dr. Oguejiofor if he believed that Plaintiff's Parkinson's disease was progressing, Dr. Oguejiofor responded, "I don't get that feeling from his recent records from Michigan Neurological Associates." (Tr. 48-49.)

#### 2.  *Plaintiff's Testimony*

Plaintiff testified that his problems with tremors, focusing, standing, and sitting prevented work. (Tr. 50.) He stated that he felt worse than he did a year or so earlier. (Tr. 53.) He provided that he did not feel confident in his ability to walk for a half-hour, that he could only focus five to ten minutes before becoming confused, and that he could not read for any period of time. (Tr. 55.) In terms of the requirements associated with sedentary work, Plaintiff testified that he could not stand or walk for two hours, or sit for six hours, in an eight-hour day. (Tr. 57-58.)

### 3. The Vocational Expert's Testimony

A vocational expert ("VE") also testified at Kurish's administrative hearing. The VE stated that Plaintiff worked from 2003 to 2007 as a design technician on computer aided design ("CAD") systems. (Tr. 62.) The VE classified this work as "light and skilled at the five level" and cited Dictionary of Occupational Titles ("DOT") code 003.362-010. (Tr. 62.) She further testified that Plaintiff's work from 2002 to 2003 as a design drafter on CAD systems corresponded to DOT code 007.281-010 and was "sedentary work [and skilled] at the seven level." (Tr. 63.) Prior to these jobs, the VE noted Plaintiff's past work as a home building supervisor. (Tr. 63.)

The ALJ next asked the VE about job availability for a hypothetical individual of Plaintiff's age, education, and work experience who (1) was capable of occasionally lifting 20 pounds, frequently lifting 10 pounds, standing and/or walking for six hours in an eight-hour workday, sitting for six hours in an eight-hours workday, pushing, pulling, and operating hand and foot controls, and occasional stair climbing, stooping, kneeling, and crouching; (2) was not capable of climbing ladders, ropes, or scaffolds; and (3) had to avoid concentrated exposure to vibration, hazardous moving machinery, and unprotected heights. (Tr. 63.) The VE testified that such an individual could perform Plaintiff's past work as either a design technician or design drafter.

The ALJ then asked the VE about a second hypothetical individual who had the same limitations as the first except that the individual was exertionally limited to sedentary work: occasionally lifting 10 pounds, frequently lifting less-than 10 pounds, standing and/or walking for two hours in an eight-hour day, and sitting for six hours in an eight-hour day. (Tr. 64.) The VE testified that this second individual could perform Plaintiff's past work as a design drafter. (*Id.*)

10

## II.  THE ADMINISTRATIVE LAW JUDGE'S FINDINGS

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and Supplemental Security Income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the

analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers

to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th

Cir. 1994).

At step one, ALJ Finnie found that Plaintiff had not engaged in substantial gainful activity

since the alleged disability onset date of February 22, 2007. (Tr. 28.) At step two, he found that

Plaintiff had the following severe impairments: Parkinsonism. (*Id.*) Next, the ALJ concluded that

this impairment does not meet or medically equal a listed impairment. (Tr. 28.) Between steps three

and four, the ALJ determined that Plaintiff had the following residual functional capacity:

> [the ability to] lift and carry 20 pounds occasionally and 10 pounds
> frequently, stand and walk for six hours out of an eight hour workday
> and sit for six hours out of an eight hour workday, limited by
> occasionally climbing ramps and stairs, stooping and kneeling, and
> no climbing ladders, ropes or scaffolds. He is also to avoid
> concentrated exposure to vibrating machinery.

(Tr. 28-29.) At step four, the ALJ found that Plaintiff was able to perform his past relevant work

as a "CAD drafter." (Tr. 35.) The ALJ therefore concluded that Plaintiff was not disabled as

defined by the Social Security Act from February 22, 2007 through the date of his decision,

February 25, 2011. (Tr. 36.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision

pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm

the Commissioner's conclusions absent a determination that the Commissioner has failed to apply

the correct legal standard or has made findings of fact unsupported by substantial evidence in the

record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation

marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a

preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).  In deciding whether substantial evidence supports the ALJ's decision, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."  *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

## IV.  ANALYSIS

Plaintiff raises two claims of error on appeal.  For one, he argues that the ALJ erred in assigning no weight to the opinions of his treating physician, Dr. Agrawal.  (ECF No. 9, Pl.'s Mot. Summ. J. at 13-16.)  Second, although the argument could have been more explicit, Kurish asserts that the ALJ's residual functional capacity assessment and hypothetical to the VE were inaccurate because they did not mention Plaintiff's "upper extremity tremors or any cognitive impairments or limitations."  (*See id.* at 11-12; *see also id.* at 8.)  The Court considers these arguments in turn.

### A.  The ALJ Did Not Commit Reversible Error in Rejecting Dr. Agrawal's Opinions

The treating-source rule generally requires an ALJ to give deference to the opinion of a claimant's treating source.  In particular, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* S.S.R. 96-2p, 1996 WL 374188 (1996).  And where an ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must then consider and apply the following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source."  *Id.*; 20 C.F.R. § 404.1527(c)(2).  In addition, the treating-source rule contains a procedural, explanatory requirement: an ALJ's narrative must contain "good reasons" for the weight given a treating-source opinion.  *See e.g.*, *Wilson*, 378 F.3d at 544; *see*

14

*also* S.S.R. 96-2p, 1996 WL 374188, at *5 (providing that a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record").

In November 2009, and again in December 2010, Dr. Agrawal authored two virtually identical opinion letters. (Tr. 277, 284.) In relevant part, they state:

> Gregory Kurish has Parkinsonism and currently manifests symptoms of Tremor, Rigidity, Bradykinesia, Festinating gait, Flat facial expression, Slowed mentation, and Depression. Patient was clinically diagnosed by neurology. . . . Some days [Mr. Kurish] is unable to get out of bed and perform duties associated with activities of daily living. Patient is affected mentally, causing depression and is unable to work or function normally, therefore is applying for disability. In my medical opinion he is totally disabled from all types of work.

(Tr. 277; *see also* Tr. 284.)

The ALJ rejected Dr. Agrawal's opinion as follows:

> The undersigned notes that the two letters from Dr. Agrawal dated November 23, 2009 and December 9, 2010 are not supported by other medical evidence of record. Dr. Agrawal's opinion that the claimant is disabled is consistent with the claimant's reported symptoms that he cannot get out of bed and do things. However, he does not provide reference to any clinical observation or narrative treatment notes. There is also no evidence of an ongoing treatment relationship with the claimant or of a trial of different medication dosages or combinations. Thus, Dr. Agrawal's opinion regarding the claimant's disability status is given no weight (Social Security Ruling 96-2p). Additionally, his opinion is regarding an issue left solely to the Commissioner of Social Security (Social Security Ruling 96-5p).

(Tr. 32.) The Court finds that this explanation is sufficient for the Court and for Plaintiff to understand why the ALJ gave "no weight" to Dr. Agrawal's opinions, and further finds that the reasons given, and weight assigned, are supported by substantial evidence.

First, Dr. Agrawal's statement that "Kurish has Parkinsonism and currently manifests

15

symptoms of Tremor, Rigidity, Bradykinesia, Festinating gait, Flat facial expression, Slowed mentation, and Depression" (Tr. 277), is merely a recitation of Plaintiff's symptoms and, as such, does not constitute a "medical opinion." 20 C.F.R. § 404.1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."); *Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) ("20 C.F.R. § 404.1527(a)(2) defines medical opinions as assertions involving judgments about a patient's 'symptoms, diagnosis and prognosis.'"); *Bieschke v. Comm'r of Soc. Sec.*, No. 1:07-CV-1125, 2009 WL 735077, at *2 (W.D. Mich. Mar. 12, 2009) ("The Magistrate correctly concluded that these statements by Dr. Kornoelje do not constitute a medical 'opinion' under the applicable regulation because his statements do not reflect any judgment about the nature of Plaintiff's impairments or articulate any limitations on her ability to function.").

Second and relatedly, the ALJ correctly concluded that Dr. Agrawal's statement that Kurish was "totally disabled from all types of work" was not entitled to deference — even if Dr. Agrawal is a treating physician. *See Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488 (6th Cir. 2010) ("[W]hen a treating physician submits a medical opinion, the ALJ must either defer to the opinion or provide 'good reason' for refusing to defer to the opinion. . . . When a treating physician instead submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is 'disabled' or 'unable to work'—the opinion is not entitled to any particular weight."); *Brock v. Comm'r of Soc. Sec.*, 368 F. App'x 622, 625 (6th Cir. 2010) (holding that ALJ correctly disregarded treating physician's statement that claimant was "100% disabled" because the regulations reserve

16

this determination for the Commissioner, and noting that the regulations further state "that no 'special significance' will be given to opinions of disability, even those made by the treating physician" (quoting 20 C.F.R. § 404.1527(e)(1), (e)(3))).

Third, the ALJ also correctly noted that Dr. Agrawal did not support his opinion with "reference to any clinical observation or narrative treatment notes."  (Tr. 32); 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion."). In fact, Dr. Agrawal's treatment notes were not even made part of the record before the ALJ — despite that the ALJ held open the record after the administrative hearing.  So even if the ALJ had wanted to independently determine whether Dr. Agrawal's findings were supported by his treatment notes, he could not.  Further, the ALJ reasonably implied that when Dr. Agrawal's said, "Some days [Mr. Kurish] is unable to get out of bed and perform duties associated with activities of daily living," he was merely recounting Plaintiff's self-reported symptoms.

Fourth, the ALJ reasonably concluded that Dr. Agrawal's findings "are not supported by other medical evidence of record."  (Tr. 32.)  Although some of the Michigan Neurology treatment notes tend to support Dr. Agrawal's findings, his findings are contradicted by substantial other evidence.  Namely, (1) Dr. Ray concluded that Plaintiff "should be able to perform his usual and customary activities including his occupational duties," (2) Dr. Choi opined that Plaintiff was capable of light work, and (3) Dr. Oguejiofor testified that Kurish could "function at the light RFC" level.

In all, the Court believes that the ALJ gave adequate reasons for rejecting Dr. Agrawal's

statements.  The ALJ reasonably concluded that they were (1) in significant part at least, not entitled to deference, (2) largely unexplained and did not reference his treatment notes, and (3) contradicted by other record evidence.  While substantial evidence might support crediting Dr. Agrawal's findings, substantial evidence also supports the ALJ's rejection.  Accordingly, this Court may not disturb the ALJ's determination.  *See Mullen*, 800 F.2d at 545 ("An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." (internal quotation marks omitted)).

### B.  Without Further Explanation, Substantial Evidence Does Not Fully Support the ALJ's RFC Assessment or Hypotheticals to the VE

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments ." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).  However, "a hypothetical question need not incorporate a listing of the claimant's medical conditions"; rather, "the vocational expert's testimony, to be reliable, must take into account the claimant's functional limitations, i.e., what he or she 'can and cannot do.'"  *Infantado v. Astrue*, 263 F. App'x 469, 476 (6th Cir. 2008) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 632-33 (6th Cir. 2004)); *see also* S.S.R. 96-8p, 1996 WL 374184, at *2 ("[Residual functional capacity] is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work- related physical and mental activities.").

Plaintiff argues that the hypotheticals the ALJ provided to the VE at the administrative

18

hearing, and, relatedly, the ALJ's residual functional capacity ("RFC") assessment, excluded important functional limitations; it follows, according to Plaintiff, that the included limitations do not accurately portray what he can still do despite his Parkinsonism.  (Pl.'s Mot. Summ. J. at 8-13.) The Court considers the physical and mental aspects of the ALJ's RFC assessment (and hypotheticals to the VE) separately.

>    1.  *Substantial Evidence Supports the ALJ's Choice of Physical Limitations in the Residual Functional Capacity Assessment*

Plaintiff cites substantial evidence that he experienced tremors and rigidity in his extremities. For example, Kurish points out that in September 2007, Dr. Konst found spasticity and significant cogwheeling bilaterally.  (Pl.'s Mot. Summ. J. at 6 (citing Tr. 231).)  Plaintiff also cites the April 2008 visit to Dr. Beall at Michigan Neurology; Dr. Beall found that Plaintiff had masked facies, saccades with pursuit, tongue tremor, bilateral cogwheeling, dysdiadochokinesia, and dysmetria. (*Id.* at 7; Tr. 225.)  Kurish further notes that, in September 2009, Dr. Ray, the DDS consultative examiner, found coarse tremor in both upper and lower extremities.  (*Id.* at 10 (citing Tr. 248).)

Based on these and other medical records, the Court agrees with Plaintiff that substantial evidence would likely support including some type of pushing, pulling, or manipulation limitation in the RFC assessment of Plaintiff.  The question on appeal, however, is whether substantial evidence supports the ALJ's choice of physical limitations, and, in particular, whether the ALJ rightly omitted limitations regarding pushing, pulling, and manipulation.  *See Mullen*, 800 F.2d at 545.

The Court believes that it does.  First, the Michigan Neurology records, which are the records that most strongly support a finding that the ALJ erred, do not include any functional assessment of Plaintiff, or, in particular, a finding that his tremors and rigidity significantly limited pushing,

pulling, or manipulation.   Second, the Court has already concluded that the ALJ reasonably discounted Dr. Agrawal's opinions.   Third, Dr. Ray examined Plaintiff in September 2009 and, despite noting coarse tremor, concluded, "Based on the history as well as physical examination it is my opinion that Gregory Kurish should be able to perform his usual and customary activities including his occupational duties."  (Tr. 248.)   Fourth, Dr. Choi reviewed the medical records available in September 2009, acknowledged prior findings of coarse tremor and "rigidity" (Tr. 269) and Plaintiff's complaints of "muscle stiffness" (Tr. 273), yet nonetheless concluded that Plaintiff could engage in light work.  (Tr. 269.)  Dr. Choi specifically indicated that Plaintiff was not limited in pushing, pulling, or manipulation.   (Tr. 269, 271.)   Fifth, at the administrative hearing, Dr. Oguejiofor testified that based on his review of the medical records — including the Michigan Neurology records — Plaintiff was capable of light work.  (Tr. 47-48.)  The Court believes that three physician opinions that Plaintiff could perform the physical demands of light work, made with knowledge of Kurish's tremors and rigidity, even when discounted by the contrary evidence of record, constitute substantial evidence supporting the ALJ's choice of physical limitations in his physical RFC assessment.

> ## 2.  *Without Further Explanation from the ALJ, Substantial Evidence Does Not Support the ALJ's Choice of Mental Limitations in the Residual Functional Capacity Assessment*

The Court does not reach the same conclusion regarding the ALJ's mental RFC assessment. There is significant evidence in the record that Plaintiff suffers from some non-negligible level of cognitive impairment.  In February 2010, Dr. Giancarlo, who had treated Kurish before and whose office has a long-term relationship with Plaintiff, conducted a neurocognitive evaluation.  (Tr. 279.) That evaluation revealed that Kurish was experiencing cognitive difficulties "especially with

20

memory function," that Plaintiff's recall and recognition were impaired, that Plaintiff's verbal fluency processing speed and attention were "deficient for [his] age," and that stress "exacerbate[d]" Kurish's memory difficulties.  (*Id.*)  In May 2010, Kurish reported to someone at Michigan Neurology that his memory had gone unchanged since the February visit, and among the medical professional's impressions was "[m]emory impairment."  (Tr. 282.)  Additionally, at the hearing before the ALJ, Plaintiff testified that he could focus for only five or ten minutes and that he could not read for any period of time.  (Tr. 55.)  Similarly, in a December 2009 function report that Plaintiff (and his counsel) completed, Kurish reported extreme fatigue, an inability to concentrate or focus, loss of memory, and easy confusion.  (Tr. 187.)

And there is little contrary evidence.  Rom Kriauciunas, Ph.D., who reviewed Plaintiff's file and completed a "Psychiatric Review Technique" form, indicated that Plaintiff had only mild difficulties in concentration, persistence, or pace.  (Tr. 264.)  But, based on the PRTF, it is clear that Dr. Kriauciunas was evaluating the effects of Plaintiff's anxiety (which he found not severe).  (Tr. 254, 259.)  The Court does not believe that Dr. Kriauciunas's anxiety-based findings speak to Plaintiff's cognitive impairments.  In fact, in the very treatment note where Dr. Giancarlo identified cognitive difficulties, Dr. Giancarlo stated, "Psychological testing . . . does not indicate the presence of anxiety disorder or other primary psychological illness" — his findings are therefore entirely in accord with Dr. Kriauciunas's.  (Tr. 279.)  As for Dr. Ray, he only conducted a physical examination of Plaintiff.  (Tr. 246-48.)  Similarly, Dr. Choi completed a "*Physical* Residual Functional Capacity Assessment" form.  (Tr. 269.)  As for Dr. Oguejiofor, it is true that he reviewed Dr. Giancarlo's February 2010 exam.  (Tr. 47.)  But he mischaracterized the report by stating that Plaintiff "complain[ed] of problems with his memory."  (*Id.*)  This statement gives the Court reason to doubt

21

whether Dr. Oguejiofor recognized that Dr. Giancarlo's findings were based on a neurocognitive evaluation of Plaintiff rather than mere self-reporting. Further, it appears to the Court that when Dr. Oguejiofor's testified that Plaintiff could perform "light" work, he was speaking to Plaintiff's physical capacity for such work.

Aside from the record evidence, the ALJ's narrative also gives the Court pause. The ALJ provided no explanation as to why he omitted all mental limitations. It is true that the ALJ made explicit that he had reviewed Dr. Giancarlo's neurocognitive exam findings. (Tr. 31.) But the ALJ never explicitly rejected those findings nor did he state that he was interpreting them as indicating a negligible mental impairment. It is true that the ALJ arguably implicitly attacked Dr. Giancarlo's findings by relying on Dr. Oguejiofor's testimony (Tr. 32); but the Court has already found that Dr. Oguejiofor appears to have (1) mischaracterized Dr. Giancarlo's treatment note and, (2) focused only Plaintiff's physical limitations. It is also true that the ALJ noted that, in a July 2009 function report, Plaintiff stated that he had no problems paying attention or following instructions. (Tr. 33; 177.) But in that very same report, Kurish provided that he has difficulty concentrating and completing tasks. (Tr. 177.) Further, the December 2009 report is later-in-time and Plaintiff's testimony was that his condition had deteriorated since (sometime in) 2009. (Tr. 53; *see also* Tr. 52.)

In sum, without further explanation from the ALJ, the Court cannot conclude that substantial evidence supports excluding all mental limitations from the RFC assessment and VE hypotheticals. Nor can the Court find that the ALJ's omission was harmless error. Plaintiff's past relevant work, as identified by the VE, requires significant cognitive ability. *See e.g.*, Dictionary of Occupational Titles, 003.362-010, Design Technician, Computer Aided, (4th ed. 1991), 1991 WL 646236

(requiring the ability to deal with problems involving several concrete variables in or from standardized situations, calculate variables and polynomials, and read methods and procedures in mechanical drawings and layout work).  The Court will not speculate as to Plaintiff's ability to perform his past or other work with additional functional limitations.

The Commissioner resists this conclusion in part by making a waiver argument.  Defendant points out that the ALJ gave Kurish's counsel the opportunity to question the VE at the administrative hearing but Plaintiff's counsel declined.  (Def.'s Mot. Summ. J. at 18 (citing Tr. 65).)  The Court agrees with the Commissioner's factual premise but questions the legal one.  The Commissioner cites *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006).  There, the claimant sought to establish a certain disability onset date and the claimant's counsel declined to follow-up on the ALJ's questioning of a medical expert about the disability onset date because counsel believed that the expert's testimony, while vague, was in the claimant's favor.  *Id.* at 837.  When the ALJ subsequently found a later onset date, the claimant appealed, and the court reasoned in part that "counsel may not now complain because he failed to cross examine [the testifying medical expert] when he had an opportunity to do so, just because he believed that [the expert] had offered a favorable opinion."  *Id.*  In contrast to *McClanahan*, Kurish does not now seek to rely on ambiguous VE testimony that could have been clarified through cross examination.  Rather, Kurish disputes the accuracy of the questioning that prompted the VE's testimony, i.e., whether the ALJ's hypothetical accurately portrays his functional limitations.  Indeed, even if Kurish's counsel had questioned the VE with more restrictive hypotheticals, nothing suggests that the ALJ would have adopted those limitations over those he ultimately included in the RFC assessment.  In fact, Kurish's challenge might be better viewed as one to the ALJ's RFC assessment, which would make the cited

23

proposition from *McClanahan* entirely inapposite.  The Commissioner's other case is also readily distinguishable.  *Cf. Baranich v. Barnhart*, 128 F. App'x 481, 489 (6th Cir. 2005) (rejecting claimant's argument that the ALJ had improperly restricted his counsel's cross-examination of the VE, and reasoning that the discontinuation of cross-examination was a result of counsel's decision "and not a directive of the ALJ").

## V.  CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 9) be GRANTED IN PART, that Defendant's Motion for Summary Judgment (ECF No. 12) be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.  On remand, the ALJ should either modify the residual functional capacity assessment based on Dr. Giancarlo's findings from the February 2010 neurocognitive exam (and then solicit additional VE testimony) or fully explain why those findings do not warrant any mental limitations in the residual functional capacity assessment.

## VI.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal

24

quotation marks omitted); *Frontier*, 454 F.3d at 596-97.  Objections are to be filed through the Case

Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies,

through the Clerk's Office.  *See* E.D. Mich. LR 5.1.  A copy of any objections is to be served upon

this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an

objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).


                              s/Laurie J. Michelson
                              LAURIE J. MICHELSON
                              UNITED STATES MAGISTRATE JUDGE

Dated:  November 6, 2012

                    CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or
parties of record by electronic means or U.S. Mail on November 6, 2012.


                              s/Jane Johnson
                              Deputy Clerk